Edward C. Walton (Bar No. 78490)
ed.walton@procopio.com
Sean M. Sullivan (Bar No. 254372)
sean.sullivan@procopio.com
PROCOPIO, CORY, HARGREAVES AND
   SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorneys for Plaintiff Powerturbine, Inc.

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO DIVISION

| | |
|---|---|
| POWERTURBINE, INC., a California corporation; FREDERICK W. GRETHER, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, DEPARTMENT OF TRANSPORTATION; UNITED STATES OF AMERICA, FEDERAL AVIATION ADMINISTRATION; PAUL CLOUTIER; KENNETH WONG; and SEVERAL UNNAMED AGENTS OF THE UNITED STATES GOVERNMENT,<br><br>Defendants. | Case No. '14CV0435 CAB BLM<br><br>**COMPLAINT FOR VIOLATION OF THE 1974 PRIVACY ACT (5 U.S.C. § 522A), AND VIOLATION OF CONSTITUTIONAL DUE PROCESS (*BIVENS* CLAIM)**<br><br>**JURY DEMAND** |

This is a Complaint seeking relief and damages against Defendants the United States of America, Federal Aviation Administration, the United States of America, Department of Transportation, Paul Cloutier, Kenneth Wong, and several Unnamed Agents of the United States Government (collectively referred to at times as "Defendants"), for, *inter alia*, violations of the Privacy Act, 5 U.S.C. § 552a, and

1
COMPLAINT

1  under the United States Constitution and under the rules recognized in *Bivens v. Six*

2  *Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

3                    **JURISDICTION AND VENUE**

4      1.      This action arises, in part, under the Privacy Act of 1974, as amended, 5

5  U.S.C. § 552a (the "Privacy Act").  This Court has jurisdiction over this matter

6  pursuant to the Privacy Act, 5 U.S.C. §§ 552a(g)(1)(D) and (5), and pursuant to the

7  United States Code, 28 U.S.C. § 1331.

8      2.      This case also arises, in part, under the Fifth Amendment to the United

9  States Constitution, and therefore this Court has jurisdiction under Art. III, Sec. 2.

10      3.      Plaintiffs are informed and believe and thereon allege that venue is

11  proper in this District pursuant to the Privacy Act, 5 U.S.C. § 552a(g)(5), and

12  pursuant to the United States Code, 28 U.S.C. § 1391, in  that a substantial part of

13  the events or omissions giving rise to the claims set forth in this Complaint took

14  place within this District, the agencies sued herein maintain offices within this

15  District, some or all of the named and unnamed defendants may reside within this

16  District, and the pertinent records of the agencies sued herein were or are located

17  within this District.

18                    **THE PARTIES**

19      4.      Plaintiff Powerturbine is a corporation duly organized and existing

20  under the laws of the state of California, with its principal place of business in

21  California.

22      5.      Plaintiff Frederick W. Grether ("Grether") is an individual citizen of the

23  United States and a resident of the state of California.

24      6.      Defendant United States of America, Department of Transportation

25  ("DOT") is an agency of the United States government.  DOT maintains offices

26  throughout the United States, including within this district.

27

28

7.    Defendant United States of America, Federal Aviation Administration ("FAA") is an agency of the United States government.  FAA maintains offices throughout the United States, including within this district.

8.    On information and belief, Defendant Paul Cloutier ("Cloutier") is an individual residing within this district.  On information and belief, at times relevant to this action, Cloutier was an employee of the FAA, and was assigned to an office within this district.

9.    On information and belief, Defendant Kenneth Wong ("Wong") is an individual residing within this district.  On information and belief, at times relevant to this action, Wong was an employee of the FAA, and was assigned to an office within this district.

10.    Defendants sued as Unnamed Agents of the United States Government are those individuals who are employed by the DOT, FAA, or other agencies of the United States government, and who engaged in the acts alleged herein, but whose individual identities are presently unknown to Plaintiffs.  Upon discovery of the individual identities of such individuals, Plaintiffs will seek leave to amend and supplement the record to include such identities.  Defendants sued as Unnamed Agents of the United States Government, together with Cloutier and Wong, are hereinafter referenced at times as "Agent Defendants."

## FACTS

### Powerturbine's Parts Management Program

11.    Powerturbine is a California corporation, formed in or around 1992.  Grether is the founder and president of Powerturbine.  Powerturbine is a well-respected airplane parts manager, and a leader in managing used jet engine parts.

12.    Powerturbine's business has centered for many years on its "Parts Management Program" ("PMP") for used aircraft parts. The PMP functions as a vital safety net for used aircraft parts which have been misdiagnosed by an FAA-licensed Maintenance, Repair and Overhaul shop ("MRO") as non-repairable, and therefore

not "airworthy." Through the PMP, Powerturbine contracts with the owners of used aircraft parts, usually major airlines, to seek "second opinion repair evaluation" of such parts.

13.   Powerturbine has PMP contracts with over 100 major airlines worldwide.   These airlines recognize there is great potential value in their used aircraft parts inventories.   New aircraft parts, especially jet engine parts, are generally expensive.   If repairable, used aircraft parts can be overhauled for a fraction of the cost of purchasing new.   The airlines join Powerturbine's PMP because they do not have the time or resources themselves to manage their own used parts inventory through a second opinion repair evaluation process which can reclaim the value of their used parts.

14.   Powerturbine has publicly promoted its PMP for some time as being directed specifically to used aircraft parts previously "rejected" by MROs.   On several occasions prior to the events giving rise to this action, Powerturbine vetted its PMP to the FAA.   At no time did the FAA ever object to the PMP or caution that the PMP presented a problem or violated any rules or laws.

15.   Once under a PMP contract, a partner airline will typically advise Powerturbine that it has in its inventory used airplane parts which may benefit from the PMP.   Powerturbine then reviews the available parts and determines their marketability, assuming they were to be brought back to airworthy condition.

16.   If an adequate market is identified for such parts, Powerturbine then engages a licensed MRO to attempt to repair and overhaul the parts to an airworthy condition.   Both internationally and domestically, only government-licensed MROs can perform such work.   In the United States, the FAA, under the DOT, licenses MROs, and publishes the performance standards for such MROs performing work pursuant to their licenses.

17.   These FAA-licensed MROs independently conduct the inspections and repairs necessary to determine the airworthiness of parts submitted to them, such as

those sent in by Powerturbine, in accordance with applicable tolerances, requirements, measurements, standards and regulations issued by the Original Equipment Manufacturers ("OEMs"), and governing bodies like the FAA.

18.     Powerturbine is not a licensed MRO.  Powerturbine relies entirely on the expertise, thoroughness and accuracy of the FAA-certified MROs which it hires to inspect, repair and overhaul the parts it submits for certification.

19.     Powerturbine does not purchase the parts it takes into the PMP. Rather, Powerturbine takes the parts on consignment from its PMP partner and submits the parts to the chosen second opinion repair MRO.  Powerturbine pays the fees charged by the MRO for work done.  If and only if the MRO certifies the parts airworthy, Powerturbine will arrange a sale to a buyer on behalf of the PMP partner, and thereafter distribute a majority share of the sale proceeds back to the PMP partner. Powerturbine returns to the PMP partner any parts the MRO deems non-repairable.

20.     The PMP works because conclusions as to the airworthiness of a used aircraft part can vary from one MRO inspection to the next.  Often airworthy parts are misdiagnosed as unserviceable by one MRO, and yet may be brought back to within acceptable standards upon another MRO performing the appropriate repairs. For instance, changes in technology, including new repair processes and advanced methodology, can lead to re-certification of used and previously rejected parts.  Also, differences in the interpretation of data and changes in specifications, can lead to re-certification.   Moreover, simply the economics of different MROs, including available resources, expertise, time and profit motives, can change a resource-prohibitive repair for one MRO into an achievable and efficient repair for another MRO.

21.     Powerturbine requires that any parts an MRO returns to Powerturbine as airworthy comply with FAA and European Aviation Safety Agency ("EASA") regulations, where applicable. In the United States an MRO can certify the airworthiness of an overhauled part by issuing for that part FAA Form 8130-3

(hereafter, "8130 Tag"), pursuant to 14 C.F.R. section 43.9 and FAA Order 8130.21G, entitled "Procedures for Completion and Use of the Authorized Release Certificates, FAA Form 8130-3, Airworthiness Approval Tag."

22.    Although not regulated by the FAA or required to maintain any certification or accreditation, Powerturbine has obtained voluntary accreditation under ISO9001: 2008, and FAA AC 00-56A, and has current certificates for both standards.

**GKN Aerospace Chem-Tronics, Inc.**

23.    GKN Aerospace Chem-Tronics, Inc. ("GKN") is an EASA and FAA-licensed MRO located in El Cajon, California.

24.    GKN represents that it is licensed for and specializes in repairs of fan blades for the IAE V2500 engine.  V2500 engine fan blades are large, metal, curved and tapered blades which have hollow cores and which spin as a part of a jet turbine engine.  These fan blades are found at the front of the jet engine and their role is to draw air into the engine to facilitate combustion.

25.    GKN has a duty to exercise the ordinary skill and competence of an FAA-licensed MRO, including without limitation strict compliance with regulations and all OEM requirements, prior to certifying a part as airworthy and issuing any 8130 Tags.

**GKN's Certification as to the Airworthiness of 57 Fan Blades for Powerturbine**

26.    Relying on GKN's representation of its expertise, on approximately June 11, 2010, Powerturbine issued several repair orders to GKN relating to sixty-three (63) used IAE V2500 engine fan blades (the "Fan Blades").  Saudi Arabian Airlines ("SAA"), a PMP partner, had consigned the Fan Blades to Powerturbine. Powerturbine disclosed in writing to GKN the Fan Blades came from SAA.

27.    Prior to SAA submitting the Fan Blades to the PMP, an MRO in Germany, MTU Maintenance Hannover GmbH ("MTU"), had removed the Fan Blades from SAA V2500 engines during regular servicing, and rejected them from

service.  The Fan Blades thus became part of SAA's used parts inventory.  SAA offered the Fan Blades on consignment to Powerturbine pursuant to the PMP, and Powerturbine, in turn, sought to obtain a "second opinion repair" evaluation by GKN.

28.    Powerturbine hired GKN to inspect the Fan Blades, and perform a repair and overhaul if possible.  Powerturbine expressly requested that GKN accomplish all applicable service bulletins and upgrades, and required that any overhaul, repair, reworks, bench checks, or modifications be done pursuant to FAA-approved or acceptable data and meet OEM specifications.  Powerturbine required that all Fan Blades deemed airworthy and returned to service be accompanied by an 8130 Tag.

29.    In or around June of 2010, GKN accepted the Powerturbine repair orders and took possession of the sixty-three (63) Fan Blades in order to perform the inspection and, if appropriate, re-certification of the Fan Blades as airworthy pursuant to the IAE OEM manual and 14 C.F.R. § 43.

30.    Of those total sixty-three (63) Fan Blades, GKN rejected six (6) as not being suitable for repair.  Meanwhile, GKN inspected the remaining fifty-seven (57) Fan Blades and determined those blades were suitable for repair and overhaul.  GKN issued 8130 Tags for those fifty-seven (57) Fan Blades.

31.    Only after GKN issued the 8130 Tags, Powerturbine sold thirty (30) of the overhauled Fan Blades on behalf of SAA directly to GKN, which had expressed an urgent need to acquire them. Powerturbine sold the remaining twenty-seven (27) overhauled Fan Blades on behalf of SAA to AirLiance Materials ("AirLiance"). Powerturbine also paid GKN for its MRO services for each of the 57 Fan Blades.

32.    On information and belief, GKN thereafter sold twenty-two (22) of its 30 Fan Blades to GA Telesis, LLC ("GAT").  In turn, GAT sold those 22 Fan Blades to Delta Airlines ("Delta").  GKN sold the other 8 of its 30 Fan Blades to AeroTurbine, Inc. ("AeroTurbine").

DOCS 119452-000003/1871147.9

**The Alleged Non-Airworthiness of the 57 Fan Blades**

33.     Powerturbine is informed and believes and thereon alleges that in or around May or June 2011, MTU inspected a Delta V2500 engine in which were installed several of the Fan Blades which GKN had certified as "overhauled" and airworthy.

34.     MTU thereafter notified Powerturbine that MTU had inspected these Fan Blades long before they were sent to GKN, and had found the thickness of the walls surrounding the hollow cores of those Fan Blades fell below required limits. MTU advised Powerturbine that it did not believe GKN could have repaired and overhauled such Fan Blades to airworthiness standards.  Powerturbine was shocked by this MTU report, given that GKN had certified to Powerturbine that the Fan Blades were airworthy.

35.     In early September 2011, representatives of GKN and Powerturbine corresponded regarding the matter, and Powerturbine sought to arrange a meeting with GKN to discuss the issues.   GKN resisted meeting.   Finally, GKN and Powerturbine representatives met and discussed the Fan Blades matter in mid-September 2011.  GKN did not further communicate with Powerturbine about the Fan Blades until the Spring of 2012.

**GKN's Communications with the FAA Regarding Plaintiffs**

36.     On information and belief, and completely unbeknownst to Powerturbine at the time, in June 2011, a representative of GKN contacted Wong, an Aviation Safety Inspector at the FAA assigned to GKN, after GKN had learned of MTU's identification of the previously-rejected Fan Blades in the Delta engine.

37.     Powerturbine is informed and believes and thereon alleges that during its communications with the FAA at that time, GKN incorrectly represented a number of matters to the FAA.  GKN told the FAA that Powerturbine had sold the "surplus stock" Fan Blades to GKN "as repairable," when in fact Powerturbine sold the Fan Blades only after GKN certified them airworthy.  GKN told the FAA that it

1  had no reason to suspect that MTU had previously rejected the Fan Blades, when in
2  fact there was clear evidence of previous attempted repairs on the surface of the Fan
3  Blades. GKN told the FAA that it had no duty to inspect the wall thickness of the
4  Fan Blades during its performance of MRO services, when in fact the OEM manual
5  and best practices required such inspection given the condition of the Fan Blades.
6  Finally, GKN told the FAA that prior to sending the Fan Blades to GKN,
7  Powerturbine violated unspecified procedures by removing reject tags and selling the
8  Fan Blades as repairable material.

9      38.    On information and belief, despite notifying the FAA of the event in
10  June 2011, no immediate action was taken on the issue of GKN's improper
11  certification of the Fan Blades, until after GKN met with Powerturbine on September
12  11, 2011. On September 13, 2011, GKN secretly contacted the FAA by telephone
13  and email, and accused Powerturbine and Grether of engaging in practices it claimed
14  were "ethically wrong."

15      39.    On information and belief, on or about the morning of September 26,
16  2011, GKN met in person with the FAA, with Alan Clendenon attending on behalf
17  of GKN, and Wong and Cloutier, the Front Line Manager-Airworthiness Unit, and
18  believed to be Mr. Wong's supervisor, attending on behalf of the FAA. During that
19  meeting, GKN essentially and incorrectly blamed its own failure to discover the thin
20  wall condition in the Fan Blades on its allegation that Powerturbine had removed
21  MTU's reject tags from the Fan Blades before passing the Fan Blades to GKN for
22  inspection, repair and overhaul.

23      40.    On information and belief, GKN told the FAA that the problem of parts
24  brokers removing reject tags was an industry-wide problem, and that Powerturbine
25  was simply the example that brought the practice to light.

26      41.    On information and belief, in the September 26th meeting with the FAA,
27  and in subsequent meetings and communications with the FAA thereafter, GKN
28  argued for acceptance of a narrow and incorrect interpretation of the OEM manual

and the term "overhaul" that did not require it to inspect the wall thickness of the Fan Blades, and thus denied blame for failing to discover such condition during its performance of MRO services for Powerturbine and certification of the Fan Blades as airworthy.

**The FAA's Acceptance and Adoption of GKN's Representations**

42.   On information and belief, over the next several months, GKN and the FAA continued to communicate regarding the Fan Blades situation, both in person and via written correspondence.  On or about November 1, 2011, GKN again met in person with the FAA representatives, including Cloutier and Wong, regarding the Fan Blades.  On information and belief, the FAA explained to GKN that it had trouble understanding how GKN could designate the Fan Blades as "OVERHAULED" without inspecting the wall thickness. The FAA demanded that GKN make a formal self-disclosure.  Plaintiffs did not know, and had no reason to know, that such communications were occurring.

43.   On information and belief, the FAA and GKN continued their communications on the issue, and in March 2012, at the insistence of the FAA, GKN began working on a self-disclosure pursuant to the Voluntary Disclosure Reporting Program ("VDRP"), despite the fact that the time limits for availing itself of the VDRP had long since lapsed.  GKN finalized the VDRP self-disclosure report in April 2012, which was assigned EIR Number: 2012WP094001.  Throughout the process, GKN continued to deny fault, and blamed Powerturbine for the mis-certification of the Fan Blades.  Again, Plaintiffs were unaware of the VDRP process, or that GKN was blaming them for GKN's faulty certification of the Fan Blades.

44.   On information and belief, the FAA personnel reviewing the matter continued to have serious doubts regarding GKN's narrow interpretation of the term "OVERHAULED."  Nevertheless, the FAA forgivingly guided GKN through the web-based VDRP process, despite its untimeliness, and assessed only minor

procedural modifications to its Fan Blade certification program, and no other penalties whatsoever.

45.   In August 2012, over a year after being on notice of the violation, and after accepting GKN's proposed "comprehensive" fix for the problems associated with the faulty certification of the Fan Blades as "overhauled," the FAA's Kenneth Wong issued a letter to GKN advising that the EIR had been closed.  In that notice Mr. Wong adopted without question GKN's allegations and solely blamed Powerturbine for the mis-certification of the Fan Blades through Powerturbine's alleged "remov[ing] the repair station reject tag from the fan blades [and sending] the fan blades to GKN for overhaul."

46.   The inconsequential VDRP and the minor investigation into GKN's mis-certification of the Fan Blades demonstrated a complete lapse in oversight by the FAA, even as it should have revealed GKN's faulty certification procedures.  On information and belief, GKN's inspectors did not in fact follow the OEM manual when performing Fan Blade inspection and repairs, but rather followed GKN's own internally-created "Operation Sheets."  The Operation Sheets represent only a subjective translation of OEM materials by a GKN employee, but not the direct instructions of the OEM.  Further, on information and belief, at least one of the GKN inspectors involved in certifying the Fan Blades as "airworthy" was issued an improper certificate by the FAA, when in fact he did not qualify for such a designation.  Likewise, on information and belief, GKN's inspection protocols failed to comply with, among perhaps other things, section 43.13(b) of Title 14 of the United States Code, which requires: "Each person maintaining or altering, or performing preventive maintenance, shall do that work in such a manner and use materials of such a quality, that the condition of the aircraft, airframe, aircraft engine, propeller, or appliance worked on will be at least equal to its original or properly altered condition (with regard to aerodynamic function, structural strength, resistance to vibration and deterioration, and other qualities affecting airworthiness)."  Despite

GKN's failure to meet these and other strict requirements, the FAA imposed no punishment on GKN, and permitted the deficient GKN fan blade repair program to continue on with only minor modifications as a result of the VDRP.

**The FAA's Records Regarding Powerturbine and Grether**

47.     Completely unknown to Powerturbine and Grether, but in connection with its communications and meetings with GKN regarding the Fan Blade situation, the FAA assimilated confidential records detailing GKN's secret allegations made against both Powerturbine and Grether.

48.     These records include, but are likely not limited to, a progressive draft document entitled "POWERTURBINE TIMELINE EVENTS-SAN-FSDO" (the "Draft Timeline Memo").  The Draft Timeline Memo is believed to have been authored, compiled, or approved by one or more individuals within the FAA or DOT, including but likely not limited to Cloutier and/or Wong, and perhaps other Agent Defendants, and specifically identifies Powerturbine and Grether, and contains confidential and private details regarding both.

49.     Essentially, the Draft Timeline Memo recounts the Fan Blades situation from GKN's biased viewpoint, but goes much further in that it also alleges criminal misconduct and extensive details of a government investigation into Powerturbine and Grether based on GKN's incorrect representations.  In fact, the Draft Timeline Memo details numerous steps the FAA, DOT, and Office of Inspector General ("OIG") had taken to investigate Powerturbine and Grether for alleged criminal violations relating to the Fan Blade transaction based on what GKN had incorrectly reported.  The Draft Timeline Memo further details how a Suspected Unapproved Parts ("SUP") report relating to the Fan Blades had been made, and that the OIG had opened a criminal investigation case in or around January 2012.  The Draft Timeline Memo further outlined the specific factual and statutory basis for a criminal case to be made against Powerturbine and/or Grether, and referenced each specifically by name in such context.

50.   Defendants FAA and DOT are required to maintain and safeguard confidential records, including but not limited to records relating to contemplated criminal accusations against persons and entities, such as Grether and Powerturbine, by, *inter alia*, limiting access to such records to only those persons whose official duties require access, and not needlessly and recklessly disseminating such records outside the bounds of official channels, including to non-governmental entities.  This obligation is confirmed by, *inter alia*, Order 2150.3B, Subject: FAA Compliance and Enforcement Program, effective date 10/01/07, and as amended thereafter.

**The Leak of the Draft Timeline Memo**

51.   Despite their obligation to maintain the confidential nature and privacy of the records regarding Powerturbine and Grether, and in particular the Draft Timeline Memo, Defendants, on information and belief, did in or about April 2012 intentionally and willfully cause such records to be disclosed publicly in violation of such duties. At the time of disclosure, the Draft Timeline Memo was not complete and had not been properly reviewed or finalized within the FAA or DOT.   On information and belief, Agent Defendants and others within the FAA nevertheless had access to the Draft Timeline Memo, as well as the means to disclose it publicly before it was properly reviewed or finalized within the FAA or DOT, and made such an improper disclosure.

52.   On information and belief, at least some of the Agent Defendants worked in the FAA regional office tasked with oversight of GKN.  On information and belief, the FAA and the Agent Defendants individually, wanted to avoid any repercussions for their faulty oversight of GKN's fan blade program.  With that in mind, Powerturbine became an easy target at which to direct the blame, and the covert leak of the Draft Timeline Memo a convenient means to accomplish that end.

53.   Recently, in response to a Congressional inquiry, the FAA admitted that it wrongfully disclosed the Draft Timeline Memo, in violation of its own procedures, to persons or entities not authorized to receive such confidential information

regarding Powerturbine and/or Grether, including but perhaps not limited to United Airlines.   Neither Powerturbine nor Grether knew of the disclosure of the Draft Timeline Memo when made, nor had any reason to know of such disclosure at such time, and to this date are both unaware of the exact timing and full extent of such disclosure. The FAA's disclosure was admittedly intentional, without any legitimate or reasonable grounds to believe it was lawful, and done with a reckless or flagrant disregard of Plaintiffs' rights.

**Plaintiffs' Cooperation with the Government**

54.   In or around early February 2012, Powerturbine received a grand jury subpoena for documents issued by the United States Attorney, directing Powerturbine to produce a substantial number of documents relating to its business and the Fan Blades to the OIG.   In shock that it would be the recipient of such a subpoena, and to demonstrate full transparency and cooperation, Grether arranged for an immediate meeting with the DOT representatives.   During the meeting with the DOT, Grether explained the Powerturbine PMP in detail, and followed up with voluntary telephone conferences and full and expeditious compliance with the subpoena.

**Plaintiffs Learn of the Defendants' Privacy Breaches**

55.   On or around April 16, 2012, through a contact at MTU, Plaintiffs learned for the first time of the existence of the Draft Timeline Memo, and the fact that such records had been publicly disclosed and circulated by Defendants to persons and entities outside the agencies, and who were not authorized to receive such confidential and private records, although the full extent of such disclosures was not made clear to Powerturbine or Grether.   Prior to April 16, 2012, Plaintiffs had no reason to know of the existence or disclosure of the Draft Timeline Memo. The recipients of the Draft Timeline Memo include, but are believed to not be limited to, representatives at MTU.   As noted above, it was recently revealed that the

1   FAA also improperly disclosed the Draft Timeline Memo to United Airlines,
2   amongst perhaps others.

3   **Defendants' Wrongful Conduct**

4        56.    The disclosure of the Draft Timeline Memo, and consequently the grand
5   jury process, by the DOT, and/or the FAA, and/or the Agent Defendants to persons
6   or entities outside of the FAA, DOT, or OIG, represents a breach of the obligation to
7   maintain privacy, confidentiality, and secrecy of its records, and in particular, a
8   violation of, perhaps among other things, FAA Order 2150.3B, and Federal Rules of
9   Criminal Procedure, Rule 6(e)(2).

10       57.    Defendants    wrongfully    disclosed—without    Plaintiffs'    consent    or
11  authorization—and failed to properly maintain and safeguard the confidential and
12  private records relating to Powerturbine and Grether, including but perhaps not
13  limited to the Draft Timeline Memo.

14       58.    Defendants did not properly maintain or safeguard the confidential and
15  private records pertaining to Plaintiffs by, *inter alia*: failing to store them in a secure
16  manner; failing to restrict access to such records only to those whose official duties
17  require access; failing to use sign-out sheets; failing to follow strict procedural
18  guidelines and rules for disclosure of such information; and failing to restrict the
19  number of employees who are able to access records through use of access codes and
20  logs.

21       59.    Powerturbine is informed and believes and on that basis alleges that
22  Defendants intentionally leaked the Draft Timeline Memo to shift blame for the Fan
23  Blades situation from GKN to Powerturbine.  Defendants knew that, once leaked, the
24  allegations contained in the Draft Timeline Memo, including the pending criminal
25  nature of the investigation in Powerturbine, would focus attention on Powerturbine's
26  operations and away from GKN's deficient MRO practices and the FAA's lax
27  investigation of GKN.  In effect, this refocusing of attention would justify the
28  minimal repercussions the FAA imposed on GKN as a result of the VDRP process,

and preserve Defendants' record of "enforcement" as to the MROs which it is charged to regulate. Further, on information and belief, the FAA compensates its employees, including Agent Defendants, based on a series of "complexity points," and a shifting of the blame to Powerturbine would avoid any Agent Defendants suffering a loss of complexity points, or a corresponding decrease in salary or rank.

**The Harm Caused to Plaintiffs**

60.     There is information contained within the aforementioned confidential and private records pertaining to Plaintiffs that is either negative, derogatory, sensitive or highly personal in nature and which would reasonably result in substantial harm, embarrassment, inconvenience, or unfairness to any individual or entity on whom such information is maintained if the security and confidentiality of such records was not maintained or safeguarded, or if such records were disclosed.

61.     The aircraft parts industry is a tightknit community, and Plaintiffs are informed and believe that the Draft Timeline Memo was widely distributed throughout the community.  Naturally, rumors about Plaintiffs began to swirl as a result.  As a direct result of the improper leak of the Draft Timeline Memo, Powerturbine and Grether suffered the loss of numerous key contracts and business prospects, lost significant business value, and were left with a tarnished image and reputation in the industry (professionally and personally) after two decades of determination, integrity and hard work to build the company.

62.     As a result of the acts giving rise to this case, Plaintiffs have suffered, and continue to suffer losses and harm, estimated to include but not be limited to lost net profits of $4,454,794, as well as continuing losses and loss of value of business enterprise, which will be according to proof at trial.

**Pending Federal Tort Claims Act Claim**

63.     Concurrently with the filing of this action, Plaintiffs have filed a claim with the FAA and DOT, pursuant to the Federal Tort Claims Action (28 U.S.C. § 2674), for among other things, negligence, intentional or negligent infliction of

emotional distress, and negligent training and supervising.   Plaintiffs reserve the right to seek amendment of this complaint to assert these and perhaps other related causes in the event that such claims are denied, whether in whole or in part.

## CAUSES OF ACTION

### COUNT I

#### Violations of the Privacy Act:

#### Plaintiff Grether versus Defendants FAA and DOT

64.   Plaintiffs hereby incorporate and re-allege each and every of the foregoing paragraphs of this Complaint as if fully set forth hereat.

65.   All of the aforementioned confidential and private information and data, including but perhaps not limited to the Draft Timeline Memo, constitute records pertaining to Plaintiff Grether (including the information contained therein and any derivative information), are maintained in a systems of records, and are protected from unauthorized disclosure under the Privacy Act, as amended, 5 U.S.C. § 552a. Such records were retrievable and accessible by Plaintiff's name and other specific identifying information.

66.   Plaintiffs are informed and believe and thereon allege that Defendants FAA and DOT, through their officials, agents and/or employees, intentionally and/or willfully disclosed and/or made available to others not authorized to obtain such information, the contents of such records maintained in a system of records, that pertained to Plaintiff Grether, including but perhaps not limited to the contents of the Draft Timeline Memo, all in contravention of Defendants' own regulations and internal policies, including but perhaps not limited to FAA Order 2150.3B, and in violation of federal regulations and rules, and in violation of the Privacy Act of 1974, as amended, 5 U.S.C. § 552a.

67.   Plaintiffs are informed and believe and thereon allege that Defendants FAA and DOT, through their officials, agents and/or employees, intentionally and/or willfully disclosed and/or made available to others the contents of records

maintained in a system of records, pertaining to Plaintiff Grether, without any official need or any official purpose.

68.    Plaintiffs are informed and believe and thereon allege that Defendants FAA and DOT, through their officials, agents and/or employees, violated 5 U.S.C. § 552a(e)(9) by intentionally and willfully failing to establish and follow rules of conduct for persons involved in the design, development, operation or maintenance of any system of records, or in maintaining any record, and Defendants FAA and DOT failed to instruct each person who was involved in the handling of confidential and private records pertaining to Plaintiff Grether with respect to such rules and the penalties for non-compliance.

69.    Plaintiffs are informed and believe and thereon allege that Defendants FAA and DOT, through their officials, agents and/or employees, violated 5 U.S.C. § 552a(c)(10) by intentionally and willfully failing to establish and follow appropriate administrative, technical and physical safeguards to ensure the security and confidentiality of Plaintiff Grether's confidential and private records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to Plaintiff Grether.

70.    Plaintiffs are informed and believe and thereon allege that Defendants FAA and DOT, through their officials, agents and/or employees, violated the Privacy Act, 5 U.S.C. § 552a(c), by failing to keep an accounting, which necessarily includes a record of the date, nature and purpose of the disclosures as well as the name and address of the person(s) to whom such disclosures were made, of any of the aforementioned unauthorized disclosures about Plaintiff Grether.

71.    As a direct and proximate result of the above-referenced violations of the Privacy Act by Defendants FAA and DOT, intentional and willful disclosures and releases of the contents of records maintained in a system of records pertaining to Plaintiff Grether have occurred and sensitive private, confidential, and personal

information about Plaintiff Grether has been released to unauthorized third parties. Such disclosures and releases by Defendants FAA and DOT without Plaintiff Grether's authorization constitutes a violation of Plaintiff Grether's rights under the Privacy Act of 1974, as amended, and is the direct and proximate cause of the damages described herein.

72.   As a direct and proximate cause of each of the above-referenced intentional and willful violations of the Privacy Act of 1974 by Defendants FAA and DOT, Plaintiff Grether has suffered an adverse effect, including but not limited to direct and indirect injury to Plaintiff Grether's reputation, embarrassment, humiliation, anxiety, physical upset, emotional upset, mental anguish, physical pain and suffering, and damage to career and his professional reputation and out-of-pocket pecuniary losses including loss of income, profits and dividends, and loss of value of his interest in Powerturbine, as well as inconvenience and unfairness and fear of further violations by Defendants of Plaintiff Grether's privacy rights. Plaintiff Grether's damages are ongoing and continuing, and subject to proof at trial.

## COUNT II

### Due Process Violation of Fifth Amendment

### Plaintiffs versus Agent Defendants

73.   Plaintiffs hereby incorporate and re-allege each and every of the foregoing paragraphs of this Complaint as if fully set forth hereat.

74.   Agent Defendants' actions as described herein violate the rights belonging to Plaintiffs under the United States Constitution, including all procedural and substantive rights owing under the Due Process Clause of the Fifth Amendment, which prohibits government officials from violating any citizen's right to due process by publicly disclosing personal, private, or confidential information without authorization or consent, and failing to follow express procedural rules and dictates, which must be scrupulously observed, and which are intended to benefit parties in Plaintiffs' positions, who would otherwise suffer the imposition of arbitrarily and

capriciously imposed harm if left unprotected from the agency's unfettered discretion.

75. In committing the conduct set forth in this Complaint, each of the Agent Defendants acted under color of federal law.

76. In committing the conduct set forth in this Complaint, Agent Defendants interfered with, foreclosed and/or rendered effectively unavailable Plaintiffs' procedural and substantive due process rights.

77. Agent Defendants' actions, orders, approvals, and omissions in violation of the Fifth Amendment give rise to a cause of action for damages directly under the United States Constitution under the rule recognized in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), and its progeny, including *Davis v. Passman*, 442 U.S. 228 (1979).

78. As a direct and proximate cause of each of the above-referenced intentional and willful violations of Plaintiffs' rights, Plaintiffs have suffered damages, including but not limited to, actual pecuniary damages and actual non-pecuniary damages in the form of direct and indirect injury to Plaintiffs' reputation, embarrassment, humiliation, anxiety, physical upset, emotional upset, mental anguish, physical pain and suffering, loss of business value, loss of income, loss of profits and dividends, property damage, and damage to career and their professional reputations. Plaintiffs' damages are ongoing and continuing and subject to proof at trial.

79. Agent Defendants' actions, as alleged herein, were undertaken with no grounds to believe that they were lawful, and constitute intentional, wanton, oppressive conduct demonstrating a flagrant disregard of Plaintiffs' rights and a deliberate indifference of Plaintiffs' Constitutionally protected rights, thus justifying an award of punitive damages.

# **PRAYER**

WHEREFORE, Plaintiff prays for relief from this Court, as follows:

a)     Award Plaintiff Grether damages, subject to proof and in an amount to be determined at trial, for violating his rights under the Privacy Act, including but not limited to statutory, actual, and/or out-of-pocket and compensatory damages for, *inter alia*, harm to reputation, embarrassment and humiliation, as well as for loss of earnings and damage to his business and career;

b)     Award Plaintiff Grether his costs and reasonable attorney fees;

c)     Award Plaintiffs damages against the Agent Defendants, subject to proof and in an amount to be determined at trial, for violating rights under the Constitution of the United States, including the Fifth Amendment thereto, including but not limited to actual and compensatory damages, *inter alia*, harm to reputation and embarrassment and humiliation, as well as for damage to business and interference with prospective economic advantages;

d)     Award Plaintiffs punitive damages against the Agent Defendants for intentional, wanton, oppressive conduct that demonstrated a deliberate indifference of Plaintiffs' Constitutionally protected rights, thus justifying such exemplary damages;

e)     Award Plaintiff Powerturbine its costs and reasonable attorney fees;

f)     Award Plaintiffs all other costs of suit incurred herein;

g)     Award for pre and post-judgment interest on the amount due at the highest legal rate; and

///

///

///

///

///

///

h)     Grant such other and further relief as the Court may deem just and proper.

DATED: February 25, 2014          PROCOPIO, CORY, HARGREAVES AND
                                                   SAVITCH LLP


                                         By:  s/Edward C. Walton
                                                Edward C. Walton
                                                Sean M. Sullivan
                                                Attorneys for Plaintiff Powerturbine,
                                                Inc.


## JURY DEMAND

Pursuant to the Federal Rules of Civil Procedure, Rule 38, and Civ.L.R. 38.1, Plaintiffs Frederick W. Grether and Powerturbine, Inc., each request a trial by jury on all claims and issues so triable.


DATED: February 25, 2014          PROCOPIO, CORY, HARGREAVES AND
                                                   SAVITCH LLP


                                         By:  s/Edward C. Walton
                                                Edward C. Walton
                                                Sean M. Sullivan
                                                Attorneys for Plaintiff Powerturbine,
                                                Inc.

DOCS 119452-000003/1871147.9